Case No. 1:20-cv-06105

---

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

---

## FIDELITY AND DEPOSIT COMPANY OF MARYLAND,

*Appellant,*

v.

## TRG VENTURE TWO LLC,

*Appellee.*

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

---

### BRIEF FOR APPELLANT
### FIDELITY AND DEPOSIT COMPANY OF MARYLAND

---

Margaret Anderson (ARDC# 3127738)
panderson@foxswibel.com
David Koropp (ARDC# 6201442)
dkoropp@foxswibel.com
Kenneth M. Thomas (ARDC# 6324750)
kthomas@foxswibel.com
FOX SWIBEL LEVIN & CARROLL LLP
200 West Madison Street, Suite 3000
Chicago, Illinois 60606
Phone: (312) 224-1234
Fax: (312) 224-1201
*Counsel for the Appellant, Fidelity and Deposit Company of Maryland*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellant Fidelity and Deposit Company of Maryland ("F&D" or "Appellant") through undersigned counsel hereby submits this Corporate Disclosure Statement. F&D declares it is a wholly owned subsidiary of Zurich American Insurance Company, a New York corporation. Zurich American Insurance Company is a wholly owned subsidiary of Zurich Holding Company of America, Inc., a Delaware corporation. Zurich Holding Company of America, Inc. is wholly owned by Zurich Insurance Company Ltd, a Swiss corporation. Zurich Insurance Company Ltd is directly owned by Zurich Insurance Group Ltd, a Swiss corporation. Zurich Insurance Group Ltd is the only publicly traded parent company, with a listing on the Swiss stock exchange, and a further trading of American Depositary Receipts. The information contained herein shall be supplemented as may be necessary under Rule 8012 or as required by this Court.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF CONTENTS ................................................................ iii

TABLE OF AUTHORITIES ............................................................ v

JURISDICTIONAL STATEMENT ..................................................... 1

ISSUES PRESENTED AND APPLICABLE STANDARD OF REVIEW ............. 2

STATEMENT OF THE CASE ........................................................... 4

FACTUAL BACKGROUND ............................................................. 5

    1.  The Parties And The Annexation Agreements ............................ 5

    2.  KHI Files For Reorganization And Is Released From Its Annexation
        Agreement Obligations ................................................... 6

    3.  Non-Debtor TRG Acquires The Properties From Non-Debtor JN1 ......... 9

    4.  TRG Does Not Claim To Be One Of The "Released Parties" For Over
        Six Years Defending Against F&D's Indemnity Claims ..................... 10

    5.  For the First Time TRG Asserts It Was Released By The Confirmation
        Order ...................................................................... 12

    6.  The Bankruptcy Court Finds F&D's Claims In The State Court Lawsuits
        Were The Sole Cause Of TRG's Damages ............................... 13

    7.  The Bankruptcy Court's Contempt Rulings Are Vacated ................... 14

    8.  The Bankruptcy Court Reinstates Its Prior Contempt Rulings ............... 15

SUMMARY OF THE ARGUMENT ..................................................... 16

ARGUMENT ............................................................................. 22

I.  The *Taggart* Standard Generally ............................................................ 22

II.  The "Objective Reasonableness" Standard ............................................. 24

III. The Bankruptcy Court Committed Reversible Error in Holding F&D in Contempt ..................................................................................... 26

    A.  There Was At Least One Objectively Reasonable Basis To Conclude The Term "Released Parties" Might Not Include TRG .............................................................................. 28

    B.  The Bankruptcy Court Erred In Applying A Subjective Standard To Determine Whether *Taggart* Was Satisfied ....................................................................... 42

    C.  The Bankruptcy Court Erred In Shifting The Burden Of Proof To F&D To Prove The *Taggart* Standard Had Not Been Satisfied ............................................................ 44

    D.  The Bankruptcy Court Abused its Discretion In Holding That TRG's Property Damages Were Proximately Caused By F&D's State Court Lawsuits ............................................. 50

CONCLUSION ........................................................................................... 54

CERTIFICATE OF SERVICE ..................................................................... 56

CERTIFICATE OF COMPLIANCE ............................................................ 57

# TABLE OF AUTHORITIES

**CASES**

AGT Crunch Chicago, LLC v. 939 N. Ave. Collection, LLC,
  2008 WL 753951 (N.D. Ill. Mar. 18, 2008) ..................................................31

Autotech Corp. v. NSD Corp.,
  1992 WL 82351 (N.D. Ill. Apr. 20, 1992).....................................................52

Bank of Commerce v. Hoffman,
  829 F.3d 542 (7th Cir. 2016) ........................................................................33

Capocy v. Kirtadze,
  183 F.3d 629 (7th Cir. 1999) ........................................................................29

Carona v. Illinois Central Gulf R.R. Co.,
  203 Ill.App.3d 947 (5th Dist. 1990) .............................................................34

City of Elgin v. Arch Ins. Co,
  2016 IL App (2d) 150013 ......................................................................11, 53

C.O.A.L., Inc. v. Dana Hotel, LLC,
  2007 IL App (1st) 161048 .............................................................................31

Countryman v. Industrial Com'n,
  292 Ill. App.3d 738 (2nd Dist. 1997) ...........................................................33

Dannhausen v. Business Publications Audit of Circulation, Inc.,
  797 F.2d 548 (7th Cir. 1986) ........................................................................51

D. Patrick, Inc. v. Ford Motor Co.,
  8 F.3d 455 (7th Cir. 1993) ......................................................................29, 47

English v. Cowell,
  969 F.2d 465 (7th Cir. 1992) ..........................................................................3

Farm Credit Bank of St. Louis v. Whitlock,
  144 Ill. 2d 440 (1991).............................................................................34, 35

Fid. & Deposit Co. of Maryland v. TRG Venture Two, LLC,
  2019 WL 5208853 (N.D. Ill. Oct. 16, 2019) .........................................passim

First Fid. Bank v. McAteer,
    985 F.2d 114 (3d Cir. 1993) ....................................................................30, 39

GNB Battery Tech., Inc. v. Gould, Inc.,
    65 F.3d 615 (7th Cir. 1995) ...............................................................................37

Harley-Davidson, Inc. v. Morris,
    19 F.3d 142 (3d Cir. 1994) .................................................................................24

Heard v. Tilden,
    809 F.3d 974 (7th Cir. 2016) .............................................................................29

Heath v. A.B. Dick Co.,
    253 F.2d 30 (7th Cir. 1958) ...............................................................................31

Hernandez v. Larry Miller Roofing, Inc.,
    628 Fed.Appx. 281 (5th Cir. 2016) ..................................................................34

Iberiabank v. Geisen (In re FFS Data),
    776 F.3d 1299 (11th Cir. 2015) .........................................................................35

In re Airadigm Commc'ns, Inc.,
    616 F.3d 642 (7th Cir. 2010) .......................................................................28, 46

In re American Media, Inc.,
    2010 WL 5483463 (Bankr. S.D.N.Y. Dec. 20, 2010) ....................................40

In re Ann Terrell,
    614 B.R. 300 (Bankr. N.D. Ill. 2020) ..............................................................26

In re Arrowmill Dev. Corp.,
    211 B.R. 497 (Bankr. D.N.J. 1997) .............................................................30, 39

In re Bateman,
    2019 WL 3731532 (B.A.P. 9th Cir. Aug. 7, 2019) ...........................23, 42, 45

In re Batista-Sanchez,
    604 B.R. 734, (Bankr. N.D. Ill. 2019) .........................................................24, 28

In re Bentley,
    607 B.R. 889 (Bankr. E.D. Ky. 2019) ..........................................................23, 42

In re Brown,
    2019 WL 3934384 (Bankr. N.D. Miss, July 24, 2019) .................................43

In re Chicago, Milwaukee, St. Paul & Pacific R.R.,
    3 F.3d 200 (7th Cir. 1993) ..................................................................2, 3, 28

In re Digital Impact, Inc.,
    223 B.R. 1 (Bankr. N.D. Okla. 1998).................................................30, 39

In re Estate of Gallagher,
    383 Ill.App.3d 901 (1st Dist. 2008)...........................................................36

In re Gravel,
    601 B.R. 873 (Bankr. D. Vt. 2019) .....................................................43, 44

In re Hazelton,
    622 B.R. 354 (W.D. Wis. 2020) .....................................................25, 22, 47

In re Ingersoll Inc.,
    562 F.3d 856 (7th Cir. 2009) .............................................................29, 30, 39

In re Jackson,
    2020 WL 718609 (Bankr. D. Conn. Feb. 12, 2020)....................................43

In re Kimball Hill Ill.,
    591 B.R. 313 (Bankr. N.D. Ill. 2018)......................................................29, 38

In re Lower Bucks Hosp.,
    471 B.R. 419 (Bankr. E.D. Pa. 2012) ..........................................................40

In re McTyeire,
    357 B.R. 898 (Bankr. M.D. Ga. 2006) ........................................................25

In re Norton,
    622 B.R. 538 (Bankr. D. Conn. 2020).........................................................27

In re Roth,
    935 F.3d 1270 (11th Cir. 2019) ...................................................................16

In re Shuey,
    606 B.R. 760 (Bankr. N.D. Ill. 2019)....................................................24, 28

In re Turner,
    101 B.R. 751 (Bankr. D. Utah 1989)..............................................................24

In re UNR Industries, Inc.,
    986 F.2d 207 (7th Cir. 1993) ........................................................................3

In re UNR Indusries, Inc.,
    173 B.R. 149 (N.D. Ill. 1994)........................................................................28

In re Weber,
    25 F.3d 413 (7th Cir. 1994) .........................................................................2

Johnson v. RJM Acquisitions, LLC,
    2012 WL 930386 (S.D. Ill. Mar. 19, 2012)...................................................51

Kirtsaeng v. John Wiley & Sons, Inc.,
    ___ U.S. ___, 136 S. Ct. 1979 (2016) ...........................................................26

Longshoremen v. Philadelphia Marine Trade Assn.,
    389 U.S. 64 (1967)........................................................................................28

Maxit, Inc. v. Van Cleve,
    231 Ill. 2d 229 (2008) ..................................................................................33

Maxwood Music Ltd. v. Malakian,
    722 F. Supp. 2d 437 (S.D.N.Y. 2010) .....................................................25, 32

Merit Ins. Co. v. Calao,
    1998 WL 74676 (N.D. Ill. July 7, 1988) ......................................................51

Patton v. Shade,
    263 B.R. 861 (C.D. Ill. 2001) ........................................................................3

Taggart v. Lorenzen,
    ____ U.S. ___, 139 S. Ct. 1975 (2019) ...................................................passim

Travelers Indem. Co. v. Bailey,
    557 U.S. 137 (2009).......................................................................................35

Trade Well Int'l v. United Central Bank,
    778 F.3d 620 (7th Cir. 2015) .......................................................................28

United City of Yorkville v. Fid. & Deposit Co. of Maryland,
2049 IL App (2d) 180230 ....................................................................6, 12, 52

United States v. City of Northlake,
Ill. 942 F.2d 1164 (7th Cir. 1991)....................................................................29

U.S. SEC v. Hyatt,
621 F.3d 687 (7th Cir. 2010) ................................................................44, 46

U.S. v. United Mine Workers of Am.,
330 U.S. 258 (1947)........................................................................................51

Village of Montgomery v. Fid. & Deposit Co. of Maryland,
2016 IL App (2d) 15057 1-U................................................................6, 11, 52

Vitalis v. Sun Construction, Inc. v. CV 2005-0101,
2020 WL 4912298 (D.V.I. Aug. 20, 2020) ...................................................23

## RULES

Fed. R. Bank. P. 8013 ..........................................................................................3

Fed. R. Bank. P. 3016(c)...............................................................................19, 40

## OTHER AUTHORITIES

Black's Law Dictionary (11th ed. 2019) ................................................................37

## **JURISDICTIONAL STATEMENT**

Appellant Fidelity and Deposit Company of Maryland ("F&D" or "Appellant") appeals from (i and ii) the Memorandum Decision and Order entered on March 20, 2017 (FD0395, FD0023); (iii) the Order entered on July 21, 2017 denying, in part, and granting, in part, the Motion of F&D to Alter and/or Amend the Enforcement Order (FD0433); (iv and v) the Memorandum Decision and Order entered on January 3, 2019 awarding damages to TRG Venture Two, LLC ("TRG or "Appellee") in the amount of $9,539,768.54 and other relief (FD0509, FD0536); and (vi and vii) the Memorandum Decision and Order entered on September 30, 2020 (FD0543, FD0557).

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. §158(a) as an appeal from the Bankruptcy Court's final order finding F&D in contempt and imposing sanctions.

The appeal was timely perfected by the filing of F&D's Notice of Appeal on October 14, 2020.

1

## ISSUES PRESENTED AND
## APPLICABLE STANDARD OF APPELLATE REVIEW

The issues in the case are:

1) Did the Bankruptcy Court err in holding F&D in contempt under the standard set forth in *Taggart v. Lorenzen*, _____ U.S. _____, 139 S. Ct. 1795, 1804 (2019), given that there were objectively reasonable bases in the record to conclude F&D's conduct might not have violated the Plan Injunction and Confirmation Order?

> This issue generally is subject to de novo review as it involves review of the Bankruptcy Court's legal conclusions. *See In re: Chicago, Milwaukee, St Paul & Pacific R.R.*, 3 F.3d 200, 206 (7th Cir. 1993). To the extent this issue requires review of the Bankruptcy Court's interpretation of the Confirmation Order, it is subject to review for abuse of discretion. *See In re: Weber*, 25 F.3d 413, 416 (7th Cir. 1994). To the extent this issue requires review of any factual findings made by the Bankruptcy Court, it is subject to review for clear error. *See In re: Chicago*, 3 F.3d at 206.

2) In deciding whether F&D should be held in contempt did the Bankruptcy Court err in basing its contempt holding on its finding that F&D subjectively acted in "bad faith" and supposedly was aware it was violating the Plan Injunction and Confirmation Order?

> This issue is subject to de novo review. *See In re: Chicago*, 3 F.3d at 206.

3) Even if the Bankruptcy Court was permitted to consider whether F&D subjectively acted in "bad faith" or knew its conduct violated the Plan

Injunction and Confirmation Order in deciding whether to hold F&D in contempt, did the Bankruptcy Court nonetheless err because there was not sufficient evidence in the record to support these factual findings?

>This issue is subject to review for clear error. *See In re: UNR Industries, Inc.,* 986 F.2d 207, 208 (7th Cir.1993); Bankruptcy Rule 8013.

4) In applying the *Taggart* standard, did the Bankruptcy Court err in placing the burden of proof on F&D to establish there was an objectively reasonable basis to conclude F&D's conduct might not have violated the Plan Injunction and Confirmation Order?

>This issue is subject to de novo review. *See In re: Chicago*, 3 F.3d at 206.

5) Did the Bankruptcy Court err in denying F&D's request to introduce evidence and testimony regarding whether there was an objectively reasonable basis to conclude F&D's conduct might not have violated the Plan Injunction and Confirmation Order?

>This issue is subject to de novo review. *See Chicago,* 3 F.3d at 206.

6) Did the Bankruptcy Court err in failing to properly assess issues of causation in its award of damages in the amount of $9,539,768.54 for the alleged contempt violation?

>This issue is reviewed for abuse of discretion. *Patton v. Shade*, 263 B.R. 861, 864 (C.D. Ill. 2001) (citing *English v. Cowell*, 969 F.2d 465, 472 (7th Cir. 1992)).

## STATEMENT OF THE CASE

This is an appeal from seven orders of the Bankruptcy Court, finding F&D in contempt and imposing sanctions in the amount of $9,539,768.54. (FD0395,[1] FD0023, FD0433, FD0509, FD0536, FD0543, FD0557). The underlying dispute arises out of a Plan Injunction and Confirmation Order that enjoins anyone who voted in favor of the Confirmation Order from suing certain defined persons and entities. (FD0197, FD0259). TRG claims to have become one of the parties released by the Confirmation Order when it purchased five undeveloped properties from another party that had purchased these assets out of the bankruptcy estate.

Each of the properties was subject to an "annexation agreement" with a municipality requiring the owner to construct various improvements. F&D issued performance bonds in favor of the municipalities to secure these obligations. When the debtors failed to construct the improvements, the municipalities sued F&D on the bonds, and two also sued TRG directly in state court as the new owner and primary obligor under the annexation agreements. F&D brought indemnity claims against TRG in the event it was held liable as the secondary obligor.

F&D, TRG and the municipalities litigated for over six years. During this time, TRG never claimed to have been released by F&D via the Confirmation Order. After losing twice in the Illinois Appellate Court on whether it had to indemnify

---

[1] FDxxxx reflect references to the record contained in F&D's Appendix.

F&D, TRG turned to the Bankruptcy Court and claimed for the first time that F&D was barred from suing TRG because TRG was a "Released Party" under the Confirmation Order.

The Bankruptcy Court agreed and held F&D in contempt for violating the Confirmation Order and assessed sanctions against F&D of almost $10 million. This Court subsequently vacated that decision and remanded the case so that it could be determined whether F&D should be held in contempt, and whether sanctions should be assessed, under the standard recently promulgated in *Taggart*. The Bankruptcy Court then reinstated its prior contempt rulings in full. This appeal followed.

## FACTUAL BACKGROUND

### 1.    The Parties And The Annexation Agreements

Prior to filing for reorganization, Kimball Hill ("KH") owned five undeveloped properties (the "Properties"). The Properties were subject to Annexation Agreements with Elgin, Montgomery, Sugar Grove, Yorkville, and Shorewood (the "Municipalities") pursuant to Illinois Municipal Code (65 ILCS 5/11.15.1-1, et seq.). The Annexation Agreements required construction of improvements (the "Improvements") before the Properties could be developed into residential subdivisions. (FD0397, FD0515).

Because the Annexation Agreements constituted covenants that ran with the land, they bound all subsequent owners of the Properties and could not be discharged

as against subsequent purchasers in bankruptcy. *Id.* at 3; Dkt. 4292, 1/3/19 Memorandum Decision at p. 7; *Village of Montgomery v. Fid. & Deposit Co. of Maryland*, 2016 IL App (2d) 150571-U, ¶ 25 (Annexation Agreement ran with the land).

F&D, a surety, issued performance bonds to secure KH's obligations to construct the Improvements. *Id.* at 3. In return, F&D had both a contractual right against KH, and a common law right against any subsequent purchasers of the Properties, to be indemnified should it be held responsible for a primary obligor's breach of the Annexation Agreements. *Id.* at 3; *See also United City of Yorkville v. Fid. & Deposit Co. of Maryland*, 2019 IL App (2d) 180230, ¶ 123, *appeal denied*, 132 N.E.3d 308 (Ill. 2019).

## 2. KHI Files For Reorganization And Is Released From Its Annexation Agreement Obligations

On April 23, 2008, KH and its various affiliates ("KHI") filed a voluntary petition for reorganization, not liquidation, pursuant to Chapter 11 (FD0397), "to continue the search for a plan sponsor for either a going concern investment in the Debtors or a sale of some or all of the Debtors' assets." (FD0038). On August 1, 2008, while the case was still a reorganization case, "F&D filed ten proofs of claims against an equal number of Debtor entities (collectively the 'F&D Claims')" asserting claims under the Indemnity Agreements, as well as claims under "principals of common law" and "Suretyship." (FD0397). On January 1, 2009, KHI

6

announced that, rather than reorganize, it would instead wind down its business. (FD0038-40).

On March 12, 2009, Judge Sonderby entered an Order (the "Confirmation Order"), confirming the Debtors' joint plan of liquidation (the "Plan"). (FD0222). By their express terms, the Plan and Confirmation Order released all claims that any parties that voted in favor of the Plan had against "the Debtors, the Post–Consummation Trust, the Liquidation Trust, and the Released Parties" (together, the "Plan Release"). (FD0229).

The Plan Release provided:

> Except as otherwise specifically provided in the Plan … Holders of Claims … voting to accept the Plan … shall be deemed to have … released ***the Debtors, the Post-Consummation Trust, the Liquidating Trust, and the Released Parties*** from ***any and all*** Claims….

(FD0229) (emphasis added).[2]

"Released Parties" were defined as:

> (a) the Debtors and their Affiliates; (b) the DIP Lender in its capacity as such; (c) the Prepetition Agent and Prepetition Lenders, each in their capacities as such; (d) the Creditors' Committee and the members thereof in their capacities as such; (e) the Indenture Trustee; (f) the Plan Administrator in its capacity as such; (g) the Liquidating Trust Administrator in its capacity as such; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entities' subsidiaries, Affiliates, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals….

---

[2] "Claim" was not limited to issues related to the bankruptcy. Instead, the term was defined to mean "any claim as defined in section 101(5) of the Bankruptcy Code against the applicable Entities referenced therein." Art. I.A.24.

(FD0228-9).

The Plan Injunction gave the Plan Release effect by enjoining all parties voting in favor of the Plan from commencing any other proceeding to pursue any claim of any type against any party expressly covered by the Plan Release. (FD0230, FD0304-5) (together, the "Plan Injunction").

The Plan also contained a "Miscellaneous Provision" stating: "The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity." (FD0317-18).

The Confirmation Order contains an identical provision but does not include the heading "Miscellaneous Provision." (FD00244). However, the Confirmation Order also provides that "[a]ny modifications to the Plan described or set forth herein constitute technical changes … and do not materially or adversely affect or change the treatment of any Claims or Interests … nor do they require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan." (FD0202).

### 3. Non-Debtor TRG Acquires The Properties From Non-Debtor JN1

On or about December 7, 2009, the KHI Trust, which was charged with liquidating what remained of the Debtors' assets, sold the Properties to JN1, LLC, who subsequently conveyed them to TRG on April 27, 2010, in exchange for $5,500,000. (FD0517). There was no sale order, and the sale was not a "free and clear" Rule 363(f) sale, because it occurred after the Confirmation Order was entered, and thus was subject to terms of that Order. (FD0562). The Annexation Agreements, as covenants that ran with the land, now obligated TRG as the new owner of the Properties to construct the Improvements.

TRG acknowledges that before it purchased the Properties, it "was aware of the Bankruptcy Cases, the Confirmation Order, the Plan and the KHI Trust Agreement … [and] would not have acquired the Purchased Property without the Bankruptcy Court's approval of each of these critical documents." (FD0436). Aware of its own obligations under the Annexation Agreements as the owner of the Properties, TRG admits that, "[i]n addition, TRG relied upon the Bonds in evaluating whether to acquire the Purchased Property, including the expectation that Fidelity (and the other sureties) would actually perform their guaranteed bond obligations." (FD0437-38). According to TRG, "[h]ad TRG known that Fidelity would, in fact, refuse to meet its obligations under the Bonds, TRG would not have acquired the Property." (FD0438).

**4. TRG Does Not Claim To Be One Of The "Released Parties" For Over Six Years Defending Against F&D's Indemnity Claims**

Upon purchasing the Properties, TRG continued to receive demands from the Municipalities and F&D to complete the Improvements as primary obligor under the Annexation Agreements. (FD0342, FD0393-94, FD0342-43).

Subsequently, the Municipalities moved for relief from the Plan Injunction to allow them to obtain rulings that the Debtors had breached the Annexation Agreements so that, in turn, they could obtain relief from F&D under the Performance Bonds. The Debtors, F&D, and the moving Municipalities ultimately entered into stipulations resolving these motions (the "Municipal Stipulations"). (FD0400). The Municipal Stipulations are substantially the same and, as approved by the Bankruptcy Court, modified the stay to allow the Municipalities to "declare KHI in default and establish liability, if any, against KHI under the Annexation Agreements for the sole purpose of recovering against the proceeds of the Performance Bonds, if any." (FD0400, FD0332).

The Stipulations provided they were "not intended to affect the rights and obligations, if any, under the Annexation Agreement between the Village and any third parties." (FD0323). And, in fact, shortly thereafter Elgin and Yorkville sued TRG directly for failing to construct the Improvements. (FD0355-58, FD0519). The remaining Municipalities sued F&D as secondary obligor via the Performance Bonds (collectively, the "State Court Lawsuits"). (FD0518).

10

F&D then filed claims against TRG alleging TRG had an obligation to indemnify F&D, the secondary obligor, in the event F&D was forced to pay out on the Performance Bonds. (FD0519). For the next six years TRG defended the cases on the merits and argued it was not bound by the Annexation Agreements. (FD0538-39). The *Elgin* Court disagreed and held that F&D stated valid claims for indemnity and unjust enrichment against TRG as primary obligor under the Annexation Agreements. *Elgin*, 2015 IL App (2d) 150013 at ¶ 32.

Likewise, in reversing a grant of summary judgment in favor of TRG, the *Montgomery* Court held TRG to be the primary obligor under the Annexation Agreements as a matter of law. *See e.g., Vill. of Montgomery*, 2016 IL App (2d) 150571-U, ¶ 25. The Illinois Supreme Court declined to review either decision. *City of Elgin v. Arch Ins. Co.*, 2015 IL App (2d) 150013, *appeal denied* 60 N.E.3d 871 (Ill. 2016); *Vill. of Montgomery v. Fid. & Deposit Co. of Maryland*, 2016 IL App (2d) 150571-U, *appeal denied* 65 N.E.3d 847 (Ill. 2016).

The *Yorkville* decision was issued after the Bankruptcy Court's decisions in this case. Due to the Bankruptcy Court's contempt decisions on appeal here, F&D was forced to withdraw its appeal of the circuit court's dismissal of F&D's claims against TRG. The Illinois Appellate Court addressed Yorkville's claim against TRG, as well as F&D's substantially identical claim against another purchaser of property, William Ryan Homes, Inc. ("WRH"). The *Yorkville* Court also held that

11

TRG and WRH are now the primary obligors under the Annexation Agreements. *Yorkville*, 2019 WL 1275325 at *15. The *Yorkville* Court similarly found that as WRH is bound by the Annexation Agreements, "a surety relationship arose by operation of law, making WRH the principal obligor and, hence, liable to Fidelity." *Id.* at *22.

### 5.    For The First Time TRG Asserts It Was Released By The Confirmation Order

In June 2016, TRG filed a Motion for Entry of an Order Enforcing Confirmation Order with the Bankruptcy Court, claiming for the first time to be one of the "Released Parties" under the Plan Injunction and Confirmation Order. As TRG explained: "[o]nly after a while did one appellate decision kind of reverse things around a little bit and suggested that there would be some liability did we come before Your Honor to suggest that they've been violating the automatic stay – or they're violating the confirmation order, and that's why we're before Your Honor right now." (FD0370).

On March 20, 2017, the Bankruptcy Court held for the first time that TRG was one of the "Released Parties" and, as a result, F&D "violated the terms of the Plan Injunction, and in so doing, has subjected itself to further order of this court and civil contempt damage." (FD0416). Applying a preponderance of the evidence standard, the Bankruptcy Court held F&D in contempt for its violation of the

Confirmation Order because, "F&D had knowledge of the release/injunction and intended the act that violated the release/injunction." (FD0409).

The Bankruptcy Court did not hold TRG was one of the "Released Parties" as that term was defined in the Plan Release provision itself. Instead, the Court relied on the "Miscellaneous Provision" of the Plan and Confirmation Order, which conferred benefits of the Plan on the "successors and assigns" of any Entity referred to in the Plan. (FD0412). When it issued its initial ruling, the Bankruptcy Court erroneously understood that "F&D does not dispute that TRG, as a successor to or assign of the Debtors and the Plan Trust, is entitled to the benefit of the Release and the Plan Injunction." (FD0399). As this Court acknowledged on appeal, however, F&D did contest that issue. *See Fid. & Deposit Co. of Maryland v. TRG Venture Two, LLC*, 2019 WL 5208853, at *4 (N.D. Ill. Oct. 16, 2019).

### 6. The Bankruptcy Court Finds F&D's Claims In The State Court Lawsuits Were The Sole Cause Of TRG's Damages

Having held F&D in contempt, the Bankruptcy Court held a separate trial to determine whether and to what extent F&D should be sanctioned. TRG sought $9,539,690 in damages comprised of $1,263,008 in legal fees, $194,300 in consultant fees, $362,382 in project/construction management fees, and $7,720,000 in lost property value. (FD0520). The Bankruptcy Court awarded TRG the entire amount. (FD0534).

The Bankruptcy Court held that "but for [F&D's]'s actions, TRG likely would have been able to sell the Property prior to TRG incurring these expenses." (FD0528). The Bankruptcy Court found that the value of the property as of January 1, 2012, assuming it could be freely sold, was $9,435,000 and the value of the property as of January 1, 2012, assuming it could not be freely sold until January 1, 2018, was $1,715,000. (FD0528-29). The $1,715,000 value was determined by estimating that the Property would be worth about $17,205,821 in 2018, subtracting carrying costs, and applying a 25% discount rate for each of the six years back to 2001. (*Id*.)

TRG did not seek to recover the legal expenses it incurred defending itself in the cases brought against it directly by Elgin and Yorkville. (FD0375). Nonetheless, TRG sought and was awarded the full amount of compensatory property damages (maintenance fees and loss of property value) for the negative effect these two litigations allegedly had on TRG's ability to resell the Properties. (FD0528, FD0534).

## 7. The Bankruptcy Court's Contempt Rulings Are Vacated

This Court subsequently vacated the Bankruptcy Court's contempt and sanctions rulings and remanded the case "for a determination of contempt under the standard articulated in *Taggart*." *Fidelity & Deposit Co. of Maryland v. TRG Venture Two, LLC*, No. 19-cv-389, 2019 WL 5208853, at *6 (N.D. Ill. Oct. 16,

14

2019).   Under *Taggart*, a bankruptcy court may only hold a party in contempt if it has been established by clear and convincing evidence that there was "no objectively reasonable basis for concluding that [party's] conduct might be lawful…." 139 S.Ct. at 1802.

### 8.     The Bankruptcy Court Reinstates Its Prior Contempt Rulings

On remand, the Bankruptcy Court placed the burden of proving the *Taggart* standard was not satisfied on F&D. (FD0553).  The Bankruptcy Court then held F&D had failed to prove the *Taggart* standard had not been met because F&D knew it was prohibited from suing TRG and because F&D "has provided no holding from case law or statute to support the theories that F&D advances in the State Court Lawsuits—that a surety may pursue a purchaser of assets through a sale under section 363(f) of the Bankruptcy Code despite the surety having settled and released its claims in the bankruptcy itself." (FD0554).  According to the Bankruptcy Court, "F&D's artificial, after-the-fact reasoning is not the measure of its actions. The measure is that F&D knew its actions were in contravention of applicable law when it took them." (*Id.*)  On this basis, the Bankruptcy Court reinstated its prior contempt ruling and sanctions order in full.  (FD0557-58)

This appeal ensued.

## SUMMARY OF THE ARGUMENT

On remand, the Bankruptcy Court committed reversible error both in holding F&D in contempt and in assessing sanctions against F&D because: (1) there were objectively reasonable bases to conclude the term "Released Parties" might not include TRG; (2) the Bankruptcy Court applied a subjective standard to determine whether *Taggart* was satisfied; (3) the Bankruptcy Court placed the burden of proof to F&D to prove the *Taggart* standard had not been satisfied; and (4) the Bankruptcy Court awarded sanctions against F&D based on harm not proximately caused by conduct that could possibly have violated the Confirmation Order.

1. *There Were Objective Bases To Conclude The Term "Released Parties" Might Not Include TRG*

This Court previously held the Bankruptcy Court did not abuse its discretion in holding F&D violated the Confirmation Order. However, as this Court also acknowledged, F&D may not be held in contempt merely because it was aware of the Confirmation Order and willfully violated it. Rather, to hold F&D in contempt, there must have been "***no*** objectively reasonable basis for concluding that [F&D's] conduct ***might*** be lawful…." *Taggart,* 139 S.Ct. at 1802 (emphasis added).

The "*Taggart* standard is a rigorous one…." *In re Roth*, 935 F.3d 1270, 1278 (11th Cir. 2019). To determine whether this rigorous standard has been met, courts examine whether the order at issue was ambiguous in any way, whether there was any case or statutory law arguably supporting the alleged contemnor's position, and

16

whether there were genuinely disputed issues of fact requiring resolution before it could be concluded the order was violated. In the instant action, there were objectively reasonable bases to conclude the Confirmation Order might be ambiguous regarding whether it released TRG, statutory and case law supporting F&D's positions, and genuinely disputed issues of fact requiring resolution before it could be conclusively determined that F&D had violated the Confirmation Order.

There were objectively reasonable bases, supported by case law, to conclude the Confirmation Order might be ambiguous as to whether TRG was included in the definition of "Released Parties." While the Plan Release clearly defines the parties being released, it is undisputed this provision does not mention purchasers of property such as TRG. The Bankruptcy Court, in turn, did not hold the definition of "Released Parties" included TRG. Rather, the Bankruptcy Court interpreted the "Miscellaneous Provision," in the Plan and Confirmation Order to enlarge the scope of the term "Released Parties" to include indirect purchasers of property once owned by the Debtors such as TRG.

Under the Miscellaneous Provision, the "benefits … of any Entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any successor … if any, of each Entity." However, there are objectively reasonable bases, all supported by case law, for concluding the definition of "Released Parties" might not be modified in this way.

17

***First***, where a conflict exists between two contract provisions, the more specific release provision controls over the more general provision. Here, the Plan Release contains a detailed definition of "Released Parties" that does not include "successors" of any sort, let alone indirect, third-party purchasers of property once owned by the Debtors. Accordingly, this provision conflicts with the broader "Miscellaneous Provision," which does include successors, and as the more specific provision, should control, particularly as against a party seeking to benefit from a release. At a minimum, the ambiguity created by the difference between the two provisions is sufficient to demonstrate the *Taggart* standard cannot be satisfied.

***Second***, there is authority for the proposition that a general release like the release at issue, which purports to release any claim F&D ever had, cannot be interpreted to release unidentified third parties. Likewise, under Illinois law claims that were unknown to parties at the time a release is executed are not considered released. Here, TRG had not yet purchased the Properties at the time F&D voted in favor of the Confirmation Plan. Accordingly, F&D could not have been aware of TRG or any specific claims it may someday have against TRG at the time it agreed to the Plan Release.

***Third***, there is an objectively reasonable basis, supported by case law, to conclude the term "successor" might not be correctly interpreted to include every person or entity that purchases property once owned by the Debtors. The term

18

"successor" is not defined in the Miscellaneous Provision and its common meaning does not necessarily include a purchaser of real property. Indeed, TRG previously argued in the State Court Lawsuits that it was not KH's "successor" to attempt to avoid liability under the Annexation Agreements.

Moreover, incorporating successors into the Plan Release would mean that creditors such as F&D released all claims, even those having nothing to do with the Properties or the KHI bankruptcy, against any party that subsequently purchases property once owned by the Debtors. It is objectively reasonable to conclude F&D might not have validly agreed to such a broad, open-ended release absent the presence of express language to this effect in the Plan Release itself.

***Fourth,*** incorporating the Miscellaneous Provision into the Plan Release might violate Rule 3016(c) of the Bankruptcy Code. Under this Rule, which courts have applied to invalidate third-party releases, the plan and disclosure statement must describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction. Unlike the Plan Release, the Miscellaneous Provision is not specific in applying to the definition of "Released Parties" because it does not define the term "successor," does not reference the release, and is not set forth in bold, italic or underlined text.

Rather than address these arguments, the Bankruptcy Court instead held F&D in contempt because "F&D has provided no holding from case law or statute to

support the theories that F&D advances in the State Court Lawsuits—that a surety may pursue a purchaser of assets through a sale under section 363(f) of the Bankruptcy Code despite the surety having settled and released its claims in the bankruptcy itself." (FD0554). This holding constitutes reversible error.

In defending against TRG's contempt motion, F&D was not limited to the arguments it made in the State Court Lawsuits, particularly given that TRG never claimed in the State Court Lawsuits that it was released by the Confirmation Order, and the *Taggart* decision had yet to be issued. Regardless, F&D never contended it could validly pursue its claims against TRG despite having previously agreed to release TRG. To the contrary, F&D contested whether TRG was in fact ever released.

To hold F&D in contempt, it was TRG's burden to prove, and the Bankruptcy Court's obligation to find, the complete absence of any objectively reasonable basis to conclude F&D's contention that TRG was not released "might" be correct. The fact that there might be other arguments that support holding F&D in contempt is irrelevant. Accordingly, the Bankruptcy Court's contempt order should be reversed.

2. *The Bankruptcy Court Applied A Subjective Standard To Determine Whether Taggart Was Satisfied*

The *Taggart* standard is objective. The Bankruptcy Court erroneously concluded the *Taggart* standard is a "subjective one," and relied on its finding that F&D knew it was violating the Confirmation Order to hold F&D in contempt.

20

According to the Bankruptcy Court, "F&D's artificial, after-the-fact reasoning is not the measure of its actions. The measure is that F&D knew its actions were in contravention of applicable law when it took them." (FD0554). Because the Bankruptcy Court's contempt holding depended on a faulty legal premise, namely, that the *Taggart* standard for contempt is subjective (i.e., based on whether F&D knew it was violating the Plan Injunction and Confirmation Order), it constitutes reversible error.

3. *The Bankruptcy Court Erroneously Shifted The Burden of Proof To F&D*

The Bankruptcy Court held that F&D's "actions were 'persistent violations' and 'persistent contumacy' of this court's orders, shifting the burden to the surety to demonstrate that the surety's belief that its pursuit of the purchaser was lawful is objectively reasonable." 620 B.R. at 898.

This ruling constituted error because the movant has the ultimate burden of proving an alleged contemnor should be held in contempt. Likewise, the Bankruptcy Court's factual findings to support shifting the burden of proof were clearly erroneous. F&D did not sue TRG in disregard of prior court rulings. No court had ever held that F&D was barred from seeking indemnity from TRG prior to F&D filing suit.

21

Accordingly, because the Bankruptcy Court erred in requiring F&D to prove the *Taggart* standard had not been satisfied, its order holding F&D in contempt should be reversed.

### 4. *The Claims Asserted By F&D Were Not The Sole Cause Of TRG's Damages*

Finally, even if F&D's conduct violated the Plan Injunction, the Bankruptcy Court abused its discretion in assessing millions of dollars in sanctions. TRG failed to prove its alleged damages were caused by F&D's pursuit of TRG in state court. All the claimed property damages were instead caused by: (1) TRG's decision, as the primary obligor, not to perform the Improvements; (2) F&D's decision, as the secondary obligor, not to pay the Municipalities where a primary obligor was available; and (3) the Municipalities' lawsuits against TRG to enforce the Annexation Agreements.

## ARGUMENT

## I. THE *TAGGART* STANDARD GENERALLY

*Taggart* represented a sea change in the way bankruptcy courts address violations of their confirmation orders. Now, much more than a mere willful violation of a confirmation order must be established. Under *Taggart*, "civil contempt may be appropriate if there is *no* objectively reasonable basis for concluding that the creditor's conduct *might* be lawful." 139 S. Ct. 1799 (emphasis added).

22

While the Bankruptcy Court correctly quoted the *Taggart* standard, it nonetheless concluded "the Supreme Court held that the proper standard in the case before it should be a subjective one.…" (FD0550). To the contrary, "the proper standard for civil contempt in bankruptcy court under *Taggart* is an objective one." *See Fidelity And Deposit Co. of Md. v. TRG Ventures Two, LLC*, 19 C 389, 2019 WL 5208853 at *5 (N.D. Ill. Oct. 16, 2019) (Judge Guzman). *Accord In re Bentley*, 607 B.R. 889, 894 (Bankr. E.D. Ky. 2019), aff'd, 19-8026, 2020 WL 3833069 (B.A.P. 6th Cir. July 8, 2020) ("The [*Taggart*] Court specifically rejected … a subjective standard for discharge injunction violations."); *In re Bateman*, 1:16-BK-00982, 2019 WL 3731532, at *6 (B.A.P. 9th Cir. Aug. 7, 2019) ("Whether the contemnor violated a court order is not based on subjective beliefs or intent in complying with the order…. The standard for evaluating civil contempt, thus, is an objective one.").

While an alleged contemnor's knowledge or intent in violating a Confirmation Order may be relevant in determining the appropriate sanction, it is not relevant to determining whether there are no objectively reasonable bases to conclude the alleged contemnor's conduct might have been lawful. *See Vitalis v. Sun Constructors, Inc.,* CV 2005-0101, 2020 WL 4912298, at *8 (D.V.I. Aug. 20, 2020) ("the [*Taggart*] Court continued by finding that subjective intent was relevant, if at all, only in determining appropriate sanctions.") (citing *Harley-Davidson, Inc. v.*

*Morris*, 19 F.3d 142, 148-49 (3d Cir. 1994) (in adjudicating civil contempt motion, "intent and willfulness are relevant only to the extent of the sanction imposed.")).

## II.    THE "OBJECTIVE REASONABLENESS" STANDARD

In deciding whether a basis for concluding a creditor's conduct might be lawful is "objectively reasonable," the *Taggart* Court emphasized that bankruptcy courts should follow "law that has long governed how courts enforce injunctions" generally. 139 S. Ct. at 1801. Courts applying this law examine whether the order at issue was ambiguous in any way, whether there was any case or statutory law arguably supporting the alleged contemnor's position, and whether there were genuinely disputed issues of fact requiring resolution before it could be concluded the order was violated. *See, e.g., In re Shuey*, 606 B.R. 760, 771 (Bankr. N.D. Ill. 2019) (reversing prior contempt holding after remand under *Taggart*).

For example, in refusing to hold a creditor in contempt the Court in *In re Batista-Sanchez*, explained: "SunTrust asserts that the lack of specific detail in the Plan does not make explicitly clear that SunTrust's second mortgage lien was extinguished at any point. While the preceding discussion explains why SunTrust is wrong as to the extinguishment of its second mortgage lien, there is some validity to its argument that the issue is not unequivocally clear." 604 B.R. 734, 741 (Bankr. N.D. Ill. 2019); *cf. In re Turner*, 101 B.R. 751, 755 (Bankr. D. Utah 1989), *superseded by statute on other grounds*, (court holds violation of Chapter 7

24

discharge injunction not willful or deliberate where there was legal authority supporting the positions of both the association and the debtor regarding whether the expenses which had been assessed postpetition were discharged by the debtor's bankruptcy); *In re McTyeire*, 357 B.R. 898, 904 (Bankr. M.D. Ga. 2006) (attempting to collect prepetition attorney fees by filing post-discharge state court contract suit against debtors was not "willful" and thus did not warrant punitive damages where although the majority view was that prepetition Chapter 7 attorney fees were discharged, ***at least one case that remained good law had held that such fees were not dischargeable***) (emphasis added).

This Court previously held the Bankruptcy Court did not abuse its discretion in interpreting the Confirmation Order to release TRG. However, that holding does not resolve whether any objectively reasonable basis exists to conclude F&D's conduct might be lawful. "[L]osing on an issue in court does not render the losing party's position 'objectively unreasonable.'" *In re: Hazelton,* 622 B.R. 354, 363 (W.D. Wis. 2020) (quoting *Maxwood Music Ltd. v. Malakian*, 722 F. Supp. 2d 437, 439 (S.D.N.Y. 2010)). In *Hazelton*, the Court declined to find the *Taggart* standard satisfied merely because the alleged contemnor did not prevail before district court on whether a student loan debt could be pursued after discharge. As the Court explained, "[c]ourts every day see reasonable defenses that ultimately fail (just as

they see reasonable claims that come to nothing.)."  622 B.R. at 363 (quoting

*Kirtsaeng v. John Wiley & Sons, Inc.,* ___U.S. ___, 136 S. Ct. 1979, 1988 (2016)).

## III.   THE BANKRUPTCY COURT COMMITTED REVERSIBLE ERROR IN HOLDING F&D IN CONTEMPT

The Bankruptcy Court's contempt ruling is without precedent in the number

and complexity of issues that had to be resolved to determine whether F&D was

barred from suing TRG.  For example, in *In re: Terrell*, a case the Bankruptcy Court

characterized as most "closely resembl[ing]" the instant action, the alleged

contemnor "ha[d] not put forth any objective explanation as to why it pursued the

post-discharge eviction other than stating that 'this is how it is always done.'"  *In re*

*Ann Terrell*, 614 B.R. 300, 305 (Bankr. N.D. Ill. 2020).

Unlike such easily distinguishable cases, multiple legitimately contested

issues had to be decided before it could be concluded that F&D's suits against TRG

violated the Plan Injunction and Confirmation Order, let alone whether F&D also

should be held in contempt for that violation.  Among these were: (1) was TRG

within the definition of "Released Parties"?; (2) if not, could the Miscellaneous

Provision be employed to enlarge of definition of this term through its reference to

"successors" to the Debtors?; (3) if it could, did the undefined term "successors"

necessarily include "purchasers of Debtors' property"? (4) if so, did such purchasers

also include entities that did not actually purchase property from the Debtors'

themselves?; and (5) in making these determinations, should ambiguities be resolved

against TRG as the benefitting party? And, resolution of each of these issues required resolution of numerous sub-issues, factual and legal, before a final conclusion could be reached.

The existence of this many contested issues requiring resolution is the antithesis what the Supreme Court identified as an appropriate contempt case; namely -- a case where there is "***no*** objectively reasonable basis for concluding that [party's] conduct ***might*** be lawful...." *Taggart*, 139 S.Ct. at 1802 (emphasis added). As *Taggart* made clear, "despite the typical discharge order lacking specificity in most instances, the same 'traditional civil contempt principles apply ... to the bankruptcy discharge context.'" *In re Norton*, 622 B.R. 538, 549 (Bankr. D. Conn. 2020) (quoting *Taggart,* 139 S. Ct. at 1802)). While bankruptcy courts may continue to require parties to comply with confirmation orders, even when their interpretation and application requires contested issues to be resolved, non-compliance with such orders no longer provides a valid basis to hold a party in contempt. *See Terrell*, 614 B.R. at 305 ("*Taggart* warns us not to impose sanctions if there is an objectively reasonable basis for concluding that the conduct might be lawful...."). Because such bases are present in the instant action, the Bankruptcy Court's order holding F&D in contempt should be reversed.

27

### A. There Was At Least One Objectively Reasonable Basis To Conclude The Term "Released Parties" Might Not Include TRG

While the Bankruptcy Court's interpretation of the Confirmation Order is entitled to deference, whether there are objectively reasonably bases to conclude the order might not have been violated presents an issue of law subject to *de novo* review. *See In re: Chicago,* 3 F.3d at 206. In making this determination, it is important to consider the applicable law governing bankruptcy plans generally, and releases within such plans as applied to non-debtors specifically, as well as the law pertaining to contempt.

Deploying the "potent weapon" of civil contempt is not appropriate unless "those who must obey" an order "will know what the court intends to require and what it means to forbid." *Shuey*, 606 B.R. at 770 (quoting *Longshoremen v. Philadelphia Marine Trade Assn.*, 389 U.S. 64, 76 (1967)). Thus, to hold a party in contempt for violating a court injunction, the moving party "must be able to point to a decree from the court which sets forth in specific detail an unequivocal command which the party in contempt violated." *Batista-Sanchez*, 604 B.R. at 740 (quoting *Trade Well Int'l v. United Central Bank*, 778 F.3d 620, 626 (7th Cir. 2015)).

In interpreting bankruptcy plans, courts follow standard principles of applicable state contract law. *See In re Airadigm Commc'ns, Inc.,* 616 F.3d 642, 664 (7th Cir. 2010); *In re: UNR Indus., Inc.*, 173 B.R. 149, 157 (N.D. Ill. 1994).

28

Releases too are construed and applied according to standard rules of contract law. (FD0413); *accord Heard v. Tilden*, 809 F.3d 974, 979 (7th Cir. 2016).

While the "intention of the parties controls the scope and effect of the release," courts determine this intent "from the language used and the circumstances of the transaction." (FD0413) (quoting *Capocy v. Kirtadze*, 183 F.3d 629, 632 (7th Cir. 1999)). "Thus, although it might otherwise be appropriate for a court to consider extrinsic evidence of the parties' intent when the plain language of a judicially approved settlement agreement is unclear (*United States v. City of Northlake, III*, 942 F.2d 1164, 1167–68 (7th Cir. 1991)), the very ambiguity necessitating such evidence rules out the possibility that the respondent has violated the ***unequivocal*** command of a court order." *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993) (emphasis in original).

"Extending releases and injunctions to non-debtors, without more, is contrary to generally-accepted bankruptcy practice." *In re Kimball Hill, Inc.*, 591 B.R. 313, 324 (Bankr. N.D. Ill. 2018). For this reason, the "Seventh Circuit has 'preached caution' in approving non-debtor releases, finding that '[i]n most instances, [non-debtor] releases…will not pass muster under [the *Airadigm*] rule.'" *Id.*, 324-25 (quoting *In re: Ingersoll Inc.,* 562 F.3d 856, 864–65 (7th Cir.2009)). In particular, the Seventh Circuit directs courts to be particularly wary of enforcing blanket releases such as the Plan Release in favor of non-debtors absent clear and

29

unambiguous evidence that creditors have affirmatively consented to such a substantial compromise of their rights. *See, e.g., Ingersoll,* 562 F.3d at 864.

Finally, for the release of a non-debtor like TRG to be deemed consensual, a creditor must have "unambiguously manifested assent to the release of a non-debtor from liability on its debt." *See In re Arrowmill Dev. Corp.,* 211 B.R. 497, 506-07 (Bankr. D.N.J. 1997); *see also First Fid. Bank v. McAteer,* 985 F.2d 114, 118 (3d Cir. 1993); *In re Digital Impact, Inc*., 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998)). Merely voting in favor of a plan is not sufficient to manifest such consent. *Id.*

Based on this and other authority, even if the Bankruptcy Court did not abuse its discretion in finding TRG had been released, there nonetheless is at least one objectively reasonable basis to conclude the Confirmation Order might not be clear and unambiguous in barring F&D from suing TRG. Accordingly, under *Taggart* the Bankruptcy Court's decision to hold F&D in contempt should be reversed.

### 1. It Is Objectively Reasonable To Conclude TRG Might Not Meet The Definition Of "Released Parties"

The Plan Release specifically identifies the parties being released. (FD0229-30, FD0304-5). It is undisputed that TRG is not a Debtor, the Post Consummation Trust, the Liquidation Trust, or one of the "Released Parties" because none of these defined terms include purchasers of property once owned by the Debtors. Under Illinois case law, if it would have been easy for parties to include a term in a release provision, here that "Released Parties" include purchasers of property once owned

by the Debtors, but they nonetheless failed to do so, the Court should assume the parties did not intend to include such a term.  *See AGT Crunch Chicago, LLC v. 939 N. Ave. Collection, LLC*, No. 07 C 2986, 2008 WL 753951, at *3 (N.D. Ill. Mar. 18, 2008) (When interpreting a contract, the court must "consider all terms included in a contract to be meaningful, [and] also find meaning in a party's failure to include a term") (citing *Heath v. A.B. Dick Co*., 253 F.2d 30, 34 (7th Cir.1958)).  Likewise, there is case support for F&D's position that the ambiguity caused by the failure to include any reference to purchasers of property once held by the Debtors in the Plan Release should be resolved against TRG, the party potentially benefitting from the release.  *See C.O.A.L., Inc. v. Dana Hotel, LLC*, 2017 IL App (1st) 161048, ¶ 67.

The omission of purchasers of property once owned by the Debtors from the Plan Release constitutes an objectively reasonable basis to conclude F&D's conduct might have been lawful.  Accordingly, the Bankruptcy Court's contempt order should be reversed.

### 2. *The Miscellaneous Provision Does Not Unequivocally Enlarge The Definition Of "Released Parties"*

The Bankruptcy Court did not hold the definition of "Released Parties" included TRG.  Rather, the Bankruptcy Court interpreted the "Miscellaneous Provision," in the Plan and Confirmation Order to enlarge the scope of the term "Released Parties" to include "successors," and interpreted the undefined term "successors" to mean indirect purchasers of property once owned by the Debtors

such as TRG. (FD0412) ("TRG is a successor entitled to the protection of the Release and Plan Injunction.").

At the time of the ruling, the Bankruptcy Court was under the erroneous understanding that F&D was not contesting whether TRG met the definition of "successor" in the Confirmation Order. (FD0410). Nonetheless, this Court upheld this ruling as not constituting an abuse of discretion for purposes of deciding whether F&D's conduct violated the Confirmation Order. *See Fid. & Deposit Co. of Maryland v. TRG Venture Two, LLC*, 2019 WL 5208853, at *4 (N.D. Ill. Oct. 16, 2019). However, that ruling does not preclude the existence of objectively reasonable bases to conclude TRG might not have been released for purposes of deciding whether F&D should be held in contempt for this violation. "[L]osing on an issue in court does not render the losing party's position 'objectively unreasonable.'" *Hazelton*, 622 B.R. at 363 (quoting *Maxwood Music Ltd. v. Malakian*, 722 F. Supp. 2d 437, 439 (S.D.N.Y. 2010)).

There are multiple objectively reasonable bases, supported by case law, for concluding the express definition of "Released Parties" might not be enlarged by the Miscellaneous Provision to include purchasers of property once owned by Debtors. Only one is required to preclude F&D from being held in contempt under *Taggart.*

***First***, while "contracts are to be interpreted as a whole ... [w]here an ambiguity exists in a contract due to a conflict between two of its provisions, the

32

more specific provision relating to the same subject matter controls over the more general provision." *Countryman v. Industrial Com'n*, 292 Ill.App.3d 738, 742 (2nd Dist. 1997).

Here, the Plan Release contains a detailed definition of "Released Parties" that does not include "successors" of any sort, let alone indirect, third-party purchasers of property once owned by the Debtors. Accordingly, this provision conflicts with the broader "Miscellaneous Provision," which does include "successors," and as the more specific provision, it should control. *See Bank of Commerce v. Hoffman*, 829 F.3d 542, 548 (7th Cir. 2016) ("[W]here an ambiguity exists in a contract due to a conflict between two of its provisions, the more specific provision relating to the same subject matter controls over the more general provision.").

At a minimum, the difference between the two provisions creates an ambiguity that must be resolved before it can be determined "unequivocally" that TRG was released. *See, e.g., Maxit, Inc. v. Van Cleve,* 231 Ill. 2d 229, 236 (2008) (court finds release ambiguous, explaining: "The parties look to separate paragraphs of the release to support their assertions…. Defendants point to the first and sixth paragraphs of the release, wherein the underinsured-motorist policy is expressly referenced…. Plaintiff, on the other hand, cites the use of the phrase 'any and all claims' in the third paragraph of the release as language that is clear and unambiguous, thus requiring defendants to consider their claim for workers'

33

compensation benefits under the Act as released."); *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447–48 (1991) (finding release ambiguous where bank released debtor with specific release language pertaining to one loan, but in a separate paragraph used general release language that might have been taken to release the debtor from another loan owed to the same bank).

Likewise, there is authority for resolving such ambiguities against TRG as the party benefitting from the release. For example, in *Carona v. Illinois Central Gulf R.R. Co.*, a settlement contract between the employee and his employer contained a specific release provision covering a work-related accident that occurred on a specified date. 203 Ill.App.3d 947, 951 (5th Dist. 1990). The contract also contained a general release from any and all claims, demands, suits, etc. whatsoever. *Id.* at 950. The court held that even though the agreement contained words of both specific and general release from the accident specified in the agreement, the employer nonetheless could not claim refuge under the broader release language because it contradicted the more specific release. *Id.* at 951. Such authority is more than sufficient to demonstrate the *Taggart* standard has not been met here.

**Second**, there is authority for the proposition that a general release like the Plan Release cannot be interpreted to release unidentified third parties. *See., e.g., Hernandez v. Larry Miller Roofing, Inc.,* 628 Fed.Appx. 281, 287-88 (5th Cir. 2016) (court rejects third-party release that did not specify the type of claims being

34

released, nor identify the released third-party by name, holding that the "boilerplate release language was not sufficiently specific to release claims against a third-party."); *accord Iberiabank v. Geisen* (*In re FFS Data*), 776 F.3d 1299, 1308–09 (11th Cir. 2015) (in determining whether release validly includes non-debtor third parties, court examines "whether the release identifies the released parties, whether the release identifies the released claims, and whether the release of those claims was an integral part of the bankruptcy order.").

Although it has cited to Fifth Circuit cases applying this specificity test, the Supreme Court has not resolved how to determine whether a general release provision is sufficiently specific to release claims against unidentified non-debtor third-parties. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 166 n.4 (2009) (Court declines to decide the "proper standard of review" if the bankruptcy court order had been ambiguous). And, while the Seventh Circuit does not appear to have expressly commented on the issue, Illinois state courts have addressed a related issue and consistently held that claims that were unknown to parties at the time a release is executed are not defeated by words of general release. *See, e.g., Whitlock*, 144 Ill. 2d at 447-48 ("Where the releasing party was unaware of other claims, Illinois case law has restricted general releases to the specific claims contained in the release agreement.").

F&D could not possibly have been aware of TRG at the time it voted in favor of the Confirmation Plan because TRG had yet to purchase the Properties, let alone refused to meet its Annexation Agreement obligations (or even be definitively held to owe such obligations for that matter). Thus, there is an objectively reasonable basis to conclude the Miscellaneous Provision might not be specific enough to validly release future claims against unidentified, non-debtor third parties such as TRG. *Cf. In re Estate of Gallagher*, 383 Ill.App.3d 901 (1st Dist. 2008).

**Third**, there is an objectively reasonable basis, supported by case law, to conclude the term "successor" might not be interpreted to include every person or entity that ever purchases property that was once owned by Debtors. Neither the Plan nor the Confirmation Order defines the term "successor," which has no generally accepted single meaning and can refer to a corporate entity that takes over the business of another corporate entity. *See, e.g.,* Black's Law Dictionary (11th ed. 2019) (defining "successor" as, *inter alia* "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation."). Indeed, that is the meaning TRG attributed to the term "successor" in the State Court Lawsuits arguing that it was not a successor to the Debtors, and thus, should not be held responsible for the obligations imposed by the Annexation Agreements. (FD0538-39).

36

Had the parties intended to include all subsequent purchasers of property once owned by Debtors in the Plan Release, it would have been a simple matter to include language to that effect. The parties' failure to do so is yet another objectively reasonable basis to decline rewriting the Plan Release provision to include that additional term. *See GNB Battery Tech., Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir.1995).

While the Bankruptcy Court previously commented that that Plan Release would be "meaningless" if it did not include third party purchasers (FD0414), it nonetheless is objectively reasonable to argue that, as written the Plan Release has meaning. It not only excuses the Debtors from any claims creditors like F&D may have had against them, it also releases the Debtors' assigns and Affiliates. Nothing more is required for the Plan Release to be valid. Moreover, even if the Plan Release was validly expanded to cover all purchasers of property once held by the Debtors, there still would have been nothing to prevent the Municipalities from suing TRG for failing to comply with the Annexation Agreements, as in fact happened, because the Annexation Agreements ran with the land, and TRG's obligation under them was not dependent on whether or not KH had been released. Accordingly, releasing F&D's claims would not have rendered the properties free and clear of the encumbrances TRG claimed were so material to their salability.

In addition, even if the term "successors" was incorporated into the Plan Release provision to modify the term "Debtors," and it was defined to include purchasers of assets once owned by the Debtors, it still would not be unequivocally clear that subsequent purchasers from non-debtors, such as TRG from JN1, also were included in the definition. As the Bankruptcy Court explained in a related case, "LCP would be hard-pressed to argue that *an interest of a non-Debtor, in this instance KHS, transferred to LCP was subject to the Release and Plan Injunction*." *Kimball Hill, Inc.*, 591 B.R. at 324 (emphasis added). Rather, "[t]he plain language of the Release and Plan Injunction clearly only extends to claims against the Debtors and their Affiliates, not against KHI as a whole. In no way did the Plan or the Confirmation Order extend these protections to non-Debtors unless such parties were Affiliates. Extending releases and injunction to non-debtors, without more, is contrary to generally-accepted bankruptcy practice." *Id.*

Given the above-referenced authority, it is not objectively unreasonable to conclude the parties' failure to define the term "successor" to include subsequent purchasers of property once owned by Debtors, or to reference such parties directly in the Plan Release, might render the Plan Release ambiguous as to whether such parties were included in the release. Accordingly, under *Taggart*, F&D may not be held in contempt for violating the Confirmation Order by suing TRG.

***Fourth,*** there is an objectively reasonable basis, supported by case and statutory law, to conclude F&D might not have validly consented to such a broad, unlimited release of non-debtors such as TRG. The "Seventh Circuit has 'preached caution' in approving non-debtor releases, finding that '[i]n most instances, [non-debtor] releases…will not pass muster under [the *Airadigm*] rule.'" *Id.* at 324-25 (quoting *In re: Ingersoll Inc.,* 562 F.3d 856, 864–65 (7th Cir.2009)). The Seventh Circuit directs courts to be particularly wary of enforcing blanket releases such as the Plan Release in favor of non-debtors absent clear and unambiguous evidence that creditors have affirmatively consented to such a substantial compromise of their rights. *See, e.g., Ingersoll,* 562 F.3d at 864.

For a release of a non-debtor to be consensual, a creditor must have "unambiguously manifested assent to the release of a non-debtor from liability on its debt." *See In re Arrowmill Dev. Corp.,* 211 B.R. 497, 506-07 (Bankr. D.N.J. 1997); *see also First Fid. Bank v. McAteer,* 985 F.2d 114, 118 (3d Cir. 1993); *In re Digital Impact, Inc*., 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998)). Merely voting in favor of a plan is not sufficient to manifest such consent. *Id.* F&D's corporate representative Greg Kilburn testified at trial that F&D never understood it was consenting to the release of successors to Debtors, or subsequent purchasers such as TRG. (FD0380-81) ("And throughout this whole thing from the beginning up to the

39

present day, it never entered our mind that the protections of the bankruptcy plan injunctions would extend to a third-party, non-debtor purchaser of discrete assets.").

***Finally***, there is authority supporting the conclusion that incorporating the Miscellaneous Provision into the Plan Release would violate the Bankruptcy Code. Under Fed. R. Bankr. P. 3106(c), "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the Code, the plan and disclosure statement shall describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." As the Advisory Note to Rule 3106(c) makes clear, courts "have assumed that the rule encompasses third-party releases." *See, e.g., In re American Media, Inc.,* 2010 WL 5483463, at *6 (Bankr. S.D.N.Y. Dec. 20, 2010)); *accord In re Lower Bucks Hosp*., 471 B.R. 419, 460, n. 62 (Bankr. E.D. Pa. 2012) (refusing to enforce plan release because disclosure statement that placed a third-party release along with boilerplate disclosures of a plan release provision relating only to the debtors "obscured the existence and significance" of the third-party release in violation of Rule 3016(c)), *aff'd, Bank of NY, Mellon Trust Co., NA v. Becker* (*In re Lower Bucks Hosp.),* 488 B.R. 303 (E.D. Pa. 2013), *aff'd, In re Lower Bucks Hosp.,* 571 Fed.App'x. 139 (3rd Cir. 2014).

In interpreting the Plan Release to include claims that might be asserted against purchasers of assets once owned by the Debtors, the Bankruptcy Court relied,

in part, on the fact that F&D asserted claims against the KHI Bankruptcy Estate for future amounts it might have to pay out on the bonds. (FD0412). As this Court explained, "The amount of the F&D Claims asserted by F&D was far in excess of amounts actually paid by it to date, and clearly sought recovery on future payments under the Performance Bonds, including by necessity in a *liquidating* case those future payments resulting from the nonperformance of the Debtors' successors and assigns." (*Id*.) (emphasis added).

However, at the time F&D first asserted its claims under the bonds, the case was proceeding as a reorganization, not a liquidation. (FD0038). When questioned at trial about F&D's "mindset" at the time it first asserted its claims against the KHI Bankruptcy Estate, F&D's representative explained: "And as to the plan back in March of '09 what my state of mind was, we had no claims on our bonds. We had no lawsuits. Number one, we hoped that our principal might survive…." (FD0380).

Even after it became a liquidation case, the mere fact that F&D continued to assert claims against the KHI Bankruptcy Estate for amounts it might have to pay out in the future does not inexorably lead to the conclusion that F&D somehow must have understood that its claims against TRG had been released. TRG sought to avoid liability to F&D by contending the Annexation Agreements were not enforceable against TRG. (FD0538-39). In the event TRG ever prevailed on this argument, F&D's only recourse would have been the claims it asserted against the KHI

41

bankruptcy estate – not because its claims against TRG were released, but because TRG was not liable under the Annexation Agreements. Accordingly, at the very least there is an objectively reasonable basis to conclude that F&D's continued assertion of claims for future bond payouts might not amount to an admission that it understood its claims against TRG were released.

For these reasons, the Bankruptcy Court's order holding F&D in contempt should be reversed.

### B. The Bankruptcy Court Erred In Applying A Subjective Standard To Determine Whether *Taggart* Was Satisfied

"[T]he proper standard for civil contempt in bankruptcy court under *Taggart* is an objective one." *See Fidelity And Deposit Co. of Md. v. TRG Ventures Two, LLC*, 19 C 389, 2019 WL 5208853 at *5 (N.D. Ill. Oct. 16, 2019) (Judge Guzman) (citing *Taggart*, 139 S. Ct. at 1804)). *Accord In re Bentley*, 607 B.R. 889, 894 (Bankr. E.D. Ky. 2019), aff'd, 19-8026, 2020 WL 3833069 (B.A.P. 6th Cir. July 8, 2020) ("The [*Taggart*] Court specifically rejected … a subjective standard for discharge injunction violations."); *In re Bateman*, 1:16-BK-00982, 2019 WL 3731532, at *6 (B.A.P. 9th Cir. Aug. 7, 2019) ("Whether the contemnor violated a court order is not based on subjective beliefs or intent in complying with the order…. The standard for evaluating civil contempt, thus, is an objective one.").

The Bankruptcy Court erred when it erroneously concluded the *Taggart* standard is a "subjective one." (FD0550). Subjective considerations come into play

only when determining whether and to what extent a party that already has been held in contempt should be sanctioned. *See In re Jackson,* 15-21233 (AMN), 2020 WL 718609, at *2 (Bankr. D. Conn. Feb. 12, 2020). ("While *Taggart* concluded a party's subjective intent was not a factor to consider for a finding of civil contempt, it could be relevant in determining the appropriate damages."); *In re Brown*, 14-11080-JDW, 2019 WL 3934384, at *2 (Bankr. N.D. Miss. July 24, 2019) (*"While *Taggart* did not focus on damages, the Supreme Court did note that subjective intent is relevant to determining damages.").

In holding F&D in contempt on remand, the Bankruptcy Court repeatedly relied on its factual finding that F&D knew it was barred by the Confirmation Order from suing TRG. (FD0552, FD0553, FD0554). According to the Bankruptcy Court, "F&D's artificial, after-the-fact reasoning is not the measure of its actions. The measure is that F&D knew its actions were in contravention of applicable law when it took them." (FD0554).

In so doing, the Bankruptcy Court relied on *In re Gravel*, 601 B.R. 873 (Bankr. D. Vt. 2019), motion to certify appeal granted, 11-10112, 2019 WL 3783317 (Bankr. D. Vt. Aug. 12, 2019). (FD0553). *Gravel*, however, lends no support to the Bankruptcy Court's holding. In *Gravel*, the alleged contemnor admitted it had violated the statute and court order at issue and "had been sanctioned once before in the same *Gravel* case, for an identical violation of Rule 3002.1…." *See In re Gravel*,

601 B.R. at 879. Accordingly, the only genuine issue in *Gravel* was what sanctions to assess for the alleged contemnor's continuing, repeated violations, an issue for which it is appropriate to consider the contemnor's subjective knowledge and intent. *See infra.*

The *Taggart* standard is an objective one that does not take into consideration an alleged contemnor's subjective beliefs about the lawfulness of its actions. Accordingly, because the Bankruptcy Court applied a subjective standard to determine whether *Taggart* had been satisfied by F&D's violation of the Confirmation Order, its order holding F&D in contempt constituted error and should be reversed.

### C. The Bankruptcy Court Erred In Shifting The Burden Of Proof To F&D To Prove The *Taggart* Standard Had Not Been Satisfied.

A party seeking a civil contempt order bears the burden of proof. *See U.S. SEC v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). In violation of this controlling principle, the Bankruptcy Court instead held that "[i]t is F&D's burden to demonstrate that its actions were reasonable under the fair ground of doubt standard." (FD0553). According to the Bankruptcy Court, once TRG "set[s] forth the facts that warrant relief," it then becomes F&D's burden to prove the *Taggart* standard was not satisfied. (FD0551). This holding constitutes new law and finds no support in *Taggart*. Accordingly, the Bankruptcy Court's contempt order constitutes error and should be reversed.

44

In support of shifting the burden of proof, the Bankruptcy Court cites an unpublished bankruptcy appellate panel decision, *In re Bateman*, 1:16-BK-00982, 2019 WL 3731532, at *6 (B.A.P. 9th Cir. Aug. 7, 2019). However, unlike the instant action, *Bateman* did not involve a release, or the issue of whether there was more than one objectively reasonable way to interpret an order. Instead, *Bateman* addressed an affirmative injunction requiring a debtor to take steps to cooperate in providing a creditor access to physical assets. *Bateman* merely held that "[o]nce a contemnor's noncompliance with a court order is established, the burden shifts, and it must produce sufficient evidence of its inability to comply to raise a question of fact…. This is because a contemnor in violation of a court order may avoid a finding of civil contempt only by showing it took all reasonable steps to comply with the order." *Id.* at *6 (citations omitted).

*Batemen* never addressed the issue of which party has the burden of proving the existence or absence of objectively reasonable bases to conclude the alleged conduct might be lawful. This is not surprising because in *Bateman* the alleged contemnors did not contest whether they were required to cooperate in providing access to the assets – they merely contested the factual issue of whether their conduct amounted to sufficient cooperation for purposes of determining whether they were in violation of the order in the first place. Accordingly, *Bateman* provides no support

45

for the Bankruptcy Court's shifting of the burden of proving the *Taggart* standard has been satisfied.

Even if there was support for shifting the burden of proof under *Taggart*, the Bankruptcy Court's factual findings supporting this shift constitute clear error because "the record contains no evidence on which the court rationally could have relied." *Airadigm,* 616 F.3d at 652. According to the Bankruptcy Court, F&D's "actions were 'persistent violations' and 'persistent contumacy' of this court's orders, shifting the burden to the surety to demonstrate that the surety's belief that its pursuit of the purchaser was lawful is objectively reasonable." (FD0550). In support, the Bankruptcy Court found that "F&D knew based on prior case law involving it and the results of its actions taken before this court, the state court and the District Court that it was acting in contravention of the Plan Injunction…. [T]his court and the District Court have repeatedly told F&D that its claims were released in the Plan and enjoined by the Plan and Confirmation Order." (FD0554)

These factual findings constitute clear error. A party seeking a civil contempt order bears the burden of proving facts warranting such relief by clear and convincing evidence. *See Hyatt*, 621 F.3d at 692. The Supreme Court has defined "clear and convincing" evidence as that which gives the finder of fact "an abiding conviction that the truth of [the proponent's] factual contentions are highly

probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1983). *Accord D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460 (7th Cir. 1993) ("highly probable").

No "clear and convincing" evidence that F&D knew the Plan and Confirmation Order barred its claims against TRG exists in the record below. The Bankruptcy Court's initial contempt ruling could not possibly have provided F&D with prior notice that it was barred from suing TRG given that the Bankruptcy Court did not issue its ruling until six years after F&D filed suit against TRG. Likewise, this Court's ruling came well after the conduct at issue had already taken place, and merely held the Bankruptcy Court's holding that F&D violated the Confirmation Order did not constitute an abuse of discretion. *Cf. Hazelton*, 622 B.R. at 361 ("Debtors point to the fact that the view they expressed to UW-Stout before reopening the case was the same view the District Court took as evidence that UW-Stout was objectively unreasonable. What this argument appears to boil down to is: objective unreasonableness is evidenced by the Debtors' win in District Court…. This argument is not compelling and ignores the way the court system functions.").

Likewise, no one testified that F&D knew TRG had been released by the Confirmation Order. To the contrary, F&D's corporate representative, Greg Kilburn, testified that F&D never understood it was consenting to the release of subsequent purchasers of property once owned by the Debtors such as TRG. (FD0380-81) ("And throughout this whole thing from the beginning up to the present

47

day, it never entered our mind that the protections of the bankruptcy plan injunctions would extend to a third-party, non-debtor purchaser of discrete assets."). F&D's understanding was fully corroborated by TRG, who never claimed to have been released in the State Court Lawsuits. (FD0407; FD0524). If the Plan Release was so clear in applying to TRG that not even one objectively reasonable basis exists to conclude it might not, it defies reason to believe TRG would not have asserted it as a defense to the State Court Lawsuits.

To attempt to explain this discrepancy, the Bankruptcy Court cited testimony from TRG's President, Peter Kyte, at page 31 of the August 29, 2018 hearing transcript (FD0388), for its finding that "Kyte testified under penalty of perjury that he did not know of the bankruptcy court as an available resource of relief until he consulted with additional counsel following the *Elgin* Decision.… TRG therefore did not know of its bankruptcy remedies until it was advised of the same – sometime between February 2016 when the *Elgin* Decision was issued and June 2016 when the motion was filed." (FD0525).

However, no such testimony appears at this page or anywhere else in the transcript. Kyte never testified he did not know of the bankruptcy court as an available resource of relief until he consulted with additional counsel following the *Elgin* Decision. Rather, Kyte consistently avoided answering direct questions about why TRG waited six years to assert the Plan Release earlier, and instead testified

48

that he simply directed TRG's attorneys to pursue the fastest resolution possible. (FD0390). ("**Q.** It's fair to say you didn't know in 2011 that specific -- that you could come to bankruptcy court, file an enforcement motion, you were given the best option and it seemed to be working, is that fair? **A.** All the attorneys that we consulted with, the consensus was the fastest way to get out of this case was to respond in state court with a motion to dismiss to be able to get out specifically because of the first kind of component that Fidelity had written a check, so that would get us out of this fast and force Fidelity to settle with municipalities, and that was the quickest path to get through this at the advice of counsel.").

At trial, F&D also introduced a document in which TRG represented, "in April 2010, in reliance on the plan and ***release of claims resulting from the plan***, TRG purchased 51 lots in the subdivision…."  (FD0347) (emphasis added).  However, on re-direct, TRG's counsel elicited the following testimony from Kyte to confirm this understanding did not include F&D's claims against TRG for indemnity:

> Q.     In this [Fidelity Ex. 25] if we could go back and open it up, it doesn't say in here that TRG knew back in April of 2010 the plan released novel unique claims never before pursued by a surety?
>
> A.     No.

(FD0391).  No party had a greater incentive to assert the Plan Release as a defense than TRG if there was reason to believe it clearly barred F&D from suing for

indemnity. TRG's failure to do so only corroborates F&D's position that the Plan Release is anything but clear or unequivocal in releasing TRG.

Likewise, the KHI Trust never objected to F&D seeking relief against TRG or claimed doing so would have any detrimental effect on the bankruptcy estate because TRG was one of the "Released Parties." To the contrary, the KHI Trust terminated the bankruptcy proceedings having concluded that resolution of the instant dispute would have no material effect on the bankruptcy estate. (FD0542) ("MR. RADTKE [attorney for KHI Trust]: I don't think this has any effect on the matter under advisement.").

There simply were no facts in the record making it "highly probable" that F&D knew it was violating the Confirmation Order by suing TRG.

For these reasons, the Bankruptcy Court erred in shifting the burden to *F&D* to prove the *Taggart* standard was not satisfied and as a result its order holding F&D in contempt should be reversed.

### D. The Bankruptcy Court Abused its Discretion In Holding That TRG's Damages Were Proximately Caused By F&D's State Court Lawsuits

The Bankruptcy Court abused its discretion in finding that F&D's assertion of claims against TRG was the proximate cause of almost $10 million dollars in damages to TRG. The damages suffered by TRG were due to: (1) TRG's own breach of the Annexation Agreements; (2) F&D's refusal to perform as secondary obligor

under those contracts in light of TRG's status as primary obligor; and (3) the Municipalities' direct claims against TRG.

Assuming, arguendo, that F&D violated the Plan Injunction, the Bankruptcy Court's authority to award sanctions was limited to reimbursing TRG for those actual losses that TRG proved were proximately caused by F&D's supposed contempt. See *U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947); *Dannhausen v. Business Publications Audit of Circulation, Inc.*, 797 F.2d 548, 550 (7th Cir. 1986). A movant can only recover damages related to litigation with a third party if the movant can prove the damages were "caused solely by [Defendants'] wrongdoing. If the third party's or the Plaintiff's actions are an intervening or superseding cause of [Plaintiff's] damages' then no damages may be recovered." *Merit Ins. Co. v. Calao*, No. 75-c-899, 1988 WL 74676, *1, (N.D. Ill. July 7, 1988). Thus, to meet its burden, TRG had to prove that its alleged losses were proximately caused by F&D seeking relief against TRG, and not by other obvious causes. *See Johnson v. RJM Acquisitions, LLC*, 2012 WL 930386, *10, 11-cv-601 (S.D. Ill. Mar. 19, 2012) (Bankruptcy Court's award of actual damage must be "reasonably incurred as a result of the violation.").

The Bankruptcy Court found that absent F&D asserting claims against TRG, the Properties would have been free and clear of any claims and TRG would have been able to sell them in 2012 for $9,435,000. (FD0528-29). The Court further found

that due solely to F&D's claims, the Properties could not be sold until 2018, reverse engineering a lowered value of the property in 2012 of only $1,715,000. (*Id*.) These causation findings constituted an abuse of discretion because they failed to accord any significance to the other obvious intervening causes for the drop in value of the Properties.

It cannot reasonably be denied that TRG was obligated under the Annexation Agreements to construct the Improvements, and the Municipalities had the legal right to require TRG to do so. *See Village of Montgomery v. Fidelity & Deposit Co. of Maryland*, 2016 IL App (2d) 150571-U, ¶25 ("We hold that, when [TRG] acquired the remaining lots in the subdivision, TRG assumed the obligations for the public improvements that are set forth in the annexation agreement."); see also *Elgin,* 2015 IL App (2d) 150013, ¶ 18-19 ("TRG argues, there is no basis upon which it can be liable to *Fidelity* for TRG's putative breach of the Annexation Agreement. This argument misunderstands the law of surety and guaranty."); *Yorkville*, 2019 IL App (2d) 180230, ¶ 75 ("TRG argues that, since it was not a party to the Annexation Agreement, it simply cannot be held liable for breaching it…TRG is mistaken.").

Likewise, it cannot be reasonably disputed that had TRG constructed the Improvements there would have been no litigation in the state courts and no cloud on TRG's title. *See Autotech Corp. v. NSD Corp.*, 1992 WL 82351, at *2, No. 88 C 3096 (N.D. Ill. Apr. 20, 1992) ("Legal expenses which would have been undertaken

to defend a suit in district court whether or not the sanctioned conduct occurred are not proximately caused by such conduct, and are not compensable" as damages for the sanctionable conduct). Accordingly, the most proximate cause of TRG's damages was TRG's own failure to construct the Improvements and not the claims brought by F&D.

Likewise, any damages caused by F&D would have been attributable to F&D's decision to defend against the Municipalities' claims on the Performance Bonds, and not because F&D filed suit against TRG, because the Properties could not be sold if the new owner might be financially responsible for the Improvements. However, F&D cannot be held in contempt for such conduct because the Confirmation Order did not bar F&D from defending against the Municipalities' claims.

Finally, F&D may not be held responsible for any damages caused by the claims brought against TRG by the Municipalities. Both Elgin and Yorkville asserted claims against TRG for breaching the Annexation Agreements. Nonetheless, the Bankruptcy Court assessed sanctions against F&D for the full amount of property damages attributable to these two properties.

TRG relied on the mistaken assumption that because F&D had issued Performance Bonds in favor of KH, TRG could purchase the Properties at a low price and resell them without undertaking the substantial expense of constructing the

Improvements. That assumption was wrong. TRG had no legal basis to force F&D to pay out on the Bonds, or to prevent the Municipalities from holding TRG responsible for not constructing the Improvements. (FD0438) ("[h]ad TRG known that Fidelity would, in fact, refuse to meet its obligations under the Bonds, TRG would not have acquired the Property."). The Bankruptcy Court's contempt order essentially provides TRG with a right it never had – the right to force F&D to either pay out on the Bonds or compensate TRG for not doing so. Nothing in the Confirmation Order provided any valid basis for granting TRG such relief.

Accordingly, because the Bankruptcy Court abused its discretion in assessing sanctions against F&D for harm not solely caused by F&D's lawsuits against TRG, its sanctions Order should be reversed.

## <u>CONCLUSION</u>

For these foregoing reasons, F&D respectfully requests that this Court reverse the Bankruptcy Court's order holding F&D in contempt, or in the alternative reverse the Bankruptcy Court's order assessing sanctions against F&D, and instead enter judgment in favor of F&D, and grant F&D any further or additional relief deemed just and necessary.

Dated: August 13, 2021                      Respectfully Submitted,


FIDELITY AND DEPOSIT COMPANY
OF MARYLAND

By: */s/ David E. Koropp*         
One of its Attorneys

Margaret Anderson (ARDC# 3127738)
panderson@foxswibel.com
David E. Koropp (ARDC# 6201442)
dkoropp@foxswibel.com
Kenneth M. Thomas (ARDC# 6324750)
kthomas@foxswibel.com
FOX SWIBEL LEVIN & CARROLL LLP
200 West Madison Street, Suite 3000
Chicago, Illinois 60606
Phone: (312) 224-1234
Fax: (312) 224-1201

55

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on this 13th day of August, 2021, he has served the foregoing instrument on all parties via the Court's CM/ECF electronic notice system.


<u>/s/ David E. Koropp</u>
David E. Koropp

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(A)(i), because this brief contains **12,673** words and **1,122** lines of text, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g). This brief complies with the typeface requirements of Federal Rule of Bankruptcy 8015(a)(5)(a) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Point 14 Times New Roman.

Dated: August 13, 2021      */s/ David E. Koropp*

David E. Koropp (ARDC# 6201442)
dkoropp@foxswibel.com
FOX SWIBEL LEVIN & CARROLL LLP
200 West Madison Street, Suite 3000
Chicago, Illinois 60606
Phone: (312) 224-1234
Fax: (312) 224-1201